[No. 43418.    En Banc.    March 20, 1975.]

THE STATE OF WASHINGTON, *Petitioner*, v. AUSTIN WENDLE SHOEMAKER et al, *Respondents.*

208

*Robert F. Patrick, Prosecuting Attorney,* for petitioner.

*William J. Powell,* for respondents (appointed counsel for appeal).

FINLEY, J.—The defendants herein were prosecuted for possession of *more than 40 grams* of controlled substances. The defense rested solely on a motion to suppress evidence on the grounds it was the product of an illegal search and seizure. This evidence was very substantially over 40 grams of controlled substances found in the spare tire compartment in the trunk of defendants' panel truck. The motion was denied and the defendants were convicted. The Court of Appeals reversed and this court subsequently granted a petition for review.

The facts are as follows: On March 2, 1972, apparently between 4:30 and 5 p.m., defendant Shoemaker, accompanied by defendant McDirmid, was driving his 1953 panel truck on U.S. Highway 195 at a speed of 45 to 50 miles per hour. Deputy Sheriff Clift was traveling on the same highway in the same direction in an unmarked vehicle. Deputy Clift approached defendants' vehicle from the rear and noticed that a left rear taillight lens was missing and that a white light was shining to the rear. The deputy passed the panel truck, observed defendant Shoemaker driving and largely as a matter of intuition became suspicious that the vehicle might contain controlled substances. The deputy subsequently pulled off the highway, let the defendants pass, and then pulled in behind the defendants again. Near Plaza, Washington, the defendants pulled off the highway and let some cars, including the deputy's vehicle, pass them. Deputy Clift then radioed ahead to the Washington State Patrol in Rosalia, advised them of the description of defendants' vehicle, of the faulty left-rear taillight lens, and that he would like to see the vehicle stopped because of

his suspicions regarding possession of controlled substances by the occupants of the panel truck.

The defendants subsequently pulled into a drive-in in Rosalia. Trooper Sly, who had heard Deputy Clift's broadcast, pulled in next to the defendants' truck and noticed the defective taillight lens. Defendant McDirmid went into the drive-in. Defendant Shoemaker approached Trooper Sly, and they discussed the taillight. Trooper Sly then entered the vehicle ostensibly to check the brakes, which he found satisfactory. But while in the truck, Trooper Sly detected the odor of marijuana.

Trooper Small then arrived at the drive-in, and was advised by Trooper Sly of the proper functioning of the brakes and of the odor of marijuana. Trooper Sly then left the scene and Trooper Small then entered the truck and made his own inspection of the brakes at which time he observed a "roach clip" between the bucket seats in a litter container with what appeared to him to be a residue of marijuana on it. By this time, Deputy Clift had arrived and stationed himself on the driver's side of the vehicle.

Thereafter, Trooper Small arrested defendant McDirmid and read him his *Miranda* rights. Prior to searching defendant McDirmid, Trooper Small advised him that it would be easier if he would produce any contraband that he might have. Defendant McDirmid handed over a bag of marijuana. Trooper Small then advised McDirmid that the entire truck would be searched and that it would be easier if he told the trooper where any contraband was located. McDirmid then told Trooper Small that more contraband could be found in the spare-tire compartment. Trooper Small looked and found a very substantial amount of contraband. It was this evidence that gave rise to the instant prosecution. During this time, Deputy Clift had arrested defendant Shoemaker, gave him his *Miranda* warnings, searched him, and found 1 gram of hashish.

The broad issue is whether the evidence discovered in the panel truck was the product of an illegal search and seizure.

The State offers two theories to justify the warrantless search of the trunk of the vehicle. The *first theory* is that the search is justifiable under the vehicle inspection doctrine of *Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925) and *Chambers v. Maroney,* 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970). This argument is comprised of three parts: (a) the *initial* entry into the vehicle can be justified either by RCW 46.64.070, which authorizes the State Patrol to enter vehicles for equipment inspections, or alternatively, the troopers had authority to stop the vehicle for driving with a defective taillight and to conduct an incidental search inside the vehicle for further evidence of the taillight infraction; (b) once inside the vehicle, the troopers smelled marijuana and observed a "roach clip" with what appeared to be a residue of marijuana on it. This gave the troopers *probable cause to believe a crime was being committed, viz,* possession of marijuana; (c) thus, Trooper Small was authorized to search the trunk of the vehicle pursuant to the *Carroll-Chambers* doctrine. The defendant counters this theory with the argument that the original entry into the panel truck was a mere pretext to search for evidence which the troopers did not have probable cause to believe was in the truck. Defendant argues that under *State v. Michaels,* 60 Wn.2d 638, 374 P.2d 989 (1962), such a search is illegal and the fruits thereof must be suppressed.

The *second theory* of the State is that notwithstanding the possible impropriety of the original entry into the truck, and the possible impropriety of the arrest of the defendants which was related to the original entry, defendant McDirmid validly consented to the search of his person and of the trunk of the vehicle. We agree with the State that a *valid consent* was given and that as a consequence of this we need not consider the validity of the State's first theory.

■ The burden is upon the State to demonstrate that consent to a search was voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788

(1968). In this regard, the record shows that Trooper Small testified as follows:

Q. And, then you say you told Mr. McDirmid you were going to search him and life would be easier if he had anything on him to produce it rather than to cause you to take it off of him? Words to that effect?
A. To that effect, yes.
Q. And, that's when you said he pulled out a bag of substance which appeared to be marijuana and handed it to you?
A. Yes, sir.

. . .
Q. All right.
A. Then prior, after the search I asked him again with reference to the Chevrolet panel if there was anything there why didn't he tell us where it was at.
Q. You also indicated to him at that time you were going to search the panel?
A. Yes, sir.
Q. It would save having the car dismantled possibly if they produced anything that was there?
A. More or less, yes.

The defendants rely upon *Bumper, supra,* where a 66-year-old, apparently uneducated, black widow who lived in a house in an isolated rural area "consented" to a search of her home after four white officials asserted they had a warrant to search the home. The alleged "consent" was determined to be "instinct with coercion" because it was obtained pursuant to an erroneous claim of lawful authority to search; thus the "consent" was held to be involuntary. Defendants argue the officials in this case similarly asserted an erroneous claim of lawful authority to search, which rendered the situation "instinct with coercion" and the consent involuntary.

█ Assuming arguendo that Trooper Small would not otherwise have had a right to search the trunk of the vehicle, we do not view the situation as being "instinct with coercion." What was implicit in *Bumper* subsequently was made explicit in *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973): that the

voluntariness of a consent to search is a question of fact to be determined by considering the totality of circumstances surrounding the alleged consent.

Several factors should be considered, including: (1) whether *Miranda* warnings had been given prior to obtaining consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the consenting person had been advised of his right not to consent. *See Bustamonte* and *United States v. Heimforth*, 493 F.2d 970 (9th Cir. 1974). These factors should be judiciously balanced against each other with no particular factor necessarily being dispositive.

Although defendant McDirmid had not been advised of his right not to consent to the search of the vehicle, he had been given his *Miranda* warnings, which necessarily means that he had been advised of his right to remain silent. Further, in contrast to the situation in *Bumper*, McDirmid, as well as defendant Shoemaker, was a college student who presumably had a far greater level of sophistication and education than the black widow whose consent was held to have been involuntary.

Under these circumstances, we do not think that the consent of McDirmid to the search of the trunk of the vehicle fairly can be described as involuntary. In short, there was a valid consent to the search and the fruits thereof were properly admitted into evidence.

For the indicated reasons, the decision of the Court of Appeals should be reversed. It is so ordered.

HUNTER, HAMILTON, WRIGHT, and BRACHTENBACH, JJ., concur.

STAFFORD, C.J., concurs in the result.

UTTER, J. (dissenting)—I cannot agree that this search can be upheld or its fruits properly admitted. The facts outlined in the majority opinion indicate that everything about the search was improper. The majority claims only that it can be sustained because defendant McDirmid "vol-

untarily" agreed to it.[1] I do not believe the demands of the Fourth Amendment can be so lightly cast aside.

Since *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973), the rules regarding consent searches have been fairly clear, at least relative to those in other areas of the Fourth Amendment.[2] Consent to search is not subject to the limitations and restrictions applicable to "waiver" of other constitutional guaranties. Knowledge of the existence of the right to withhold consent is not prerequisite to the validity of its grant, at least where the person giving it is not in police custody. *Schneckloth* at pages 235-46, 249. Consent is binding if "voluntary," and voluntariness is "to be determined from all the circumstances." *Schneckloth* at pages 248-49.

The burden is always on the prosecution to show that consent was given voluntarily. *Schneckloth v. Bustamonte*, *supra* at 222; *Bumper v. North Carolina*, 391 U.S. 543, 548, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968). This burden is particularly heavy where the consent is given by a person under arrest. *United States v. Hearn*, 496 F.2d 236, 244 (6th Cir. 1974); *United States v. DeMarco*, 488 F.2d 828, 831

---

[1] As noted in the majority opinion, the defendants have contended primarily that the search was illegal because of the absence of probable cause to stop and search their vehicle. They have not responded to the State's arguments on consent. It would appear that the "consent" here was a product of the stop and initial search, and that it is therefore tainted with the illegality of those actions and invalid apart from any question of voluntariness. *See United States v. Horton*, 488 F.2d 374, 380 n.5 (5th Cir. 1973), *cert. denied*, 416 U.S. 993 (1974); *United States v. Ward*, 488 F.2d 162 (9th Cir. 1973); *cf. Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974). But this issue has not been raised on appeal, and the majority's interposition of the barrier of "consent" between the initial illegalities and the ultimate search is thus made possible.

[2] *See* LaFave, *Search and Seizure: "The Course of True Law . . . Has Not . . . Run Smooth"*, U. Ill. L.F. 225 (1966). As is so often the case when substantive rules are pronounced, however, the clarification in *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973) came at the cost of obscuring the theoretical foundations of the consent doctrine. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 358 (1974).

n.7 (2d Cir. 1973); *Villano v. United States*, 310 F.2d 680 (10th Cir. 1962). "[A]rrest carries its own aura of coercion," (*Gorman v. United States*, 380 F.2d 158, 163 (1st Cir. 1967)), and because it does, the State must show that the consent was voluntary, was not the product of such coercion, "by clear and convincing evidence." *United States v. Mapp*, 476 F.2d 67, 77 (2d Cir. 1973).[3]

The prosecution in this case did not and could not make this required showing. Virtually every aspect of the circumstances surrounding this search adds to, rather than overcomes, the presumption of coercion. First, it is significant, even if not conclusive, that Mr. McDirmid was not warned of his right to refuse. *Schneckloth v. Bustamonte, supra* at 226; *United States v. Hearn, supra* at 244; *United States v. Heimforth, supra* at 972. In addition, the number of policemen involved in the arrest and search (*United States v. Hearn, supra* at 244) and the fact that the location was not defendants' home or other familiar surroundings (*United States v. Ruiz-Estrella*, 481 F.2d 723, 727 (2d Cir. 1973)) militate against a holding of voluntariness. So, too, does the fact that the original suggestion that the search be made came from the police rather than the suspects (*United States v. Hearn, supra* at 244), in terms amounting to a "claim of right" (*Bumper v. North Carolina, supra; Holloway v. Wolff*, 482 F.2d 110, 114 (8th Cir. 1973)), which was unfounded and constituted a misrepresentation by the searching officers. *United States v. Rothman*, 492 F.2d 1260, 1265 (9th Cir. 1973).

The two factors discussed by the majority, the defendants' educational level and the giving of *Miranda* warnings,

---

[3]In *Schneckloth* the court hinted strongly that the presumption of coercion in in-custody consent cases is so strong that it cannot be overcome unless it is shown that the defendant was informed or otherwise aware of his right to refuse permission to search. *Schneckloth v. Bustamonte, supra* at 241 n.29. The circuits have rejected such a per se rule, however, and held that arrest is only one factor to be considered in weighing the totality of the circumstances. *United States v. Heimforth*, 493 F.2d 970 (9th Cir. 1974), *cert. denied*, 416 U.S. 908 (1974); *United States v. Mapp*, 476 F.2d 67 (2d Cir. 1973).

fall far short of overbalancing these considerations. *Miranda* warnings say nothing about the right to refuse to consent to a search, and any implication they may give that silence is permissible was more than overcome in this case by Trooper Small's subsequent threat to dismantle the car if the search were not allowed. The advantages of a college education do not necessarily include the knowledge that a policeman cannot do whatever he threatens to do to a person or vehicle in his custody.

Hard cases make bad law, and I recognize that it is increasingly hard for judges to vacate the sentences of obviously guilty criminal defendants on the ground that the evidence establishing their guilt was unlawfully seized. The exclusionary rule exacts a heavy toll on the substantive law it is intended to enforce, as courts are loathe to find one violation of law where the consequence of so doing is the inability to punish another. The Fourth Amendment must mean something, however, and until an alternative enforcement device is developed which may excuse the constitutional requirement of exclusion,[4] the bounds of its meaning must be defined through application of that rule. If it is wrong that "[t]he criminal is to go free because the constable has blundered," (*People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585 (1926)), it is equally wrong that the constable's blunder is to go unrecognized in order that the criminal *not* go free.

The exclusionary rule, created to protect the Fourth Amendment, seems to be destroying it. I have no doubt that were this a problem in constitutional law presented in the abstract, without the specter of a second miscarriage of justice attached to a condemnation of the first, this court would denounce this search. If the Fourth Amendment is to survive, and protect innocent citizens as well as criminal

---

[4] *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 411, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971) (Burger, C.J., dissenting); *State v. Rousseau*, 40 Wn.2d 92, 100, 241 P.2d 447 (1952) (Finley, J., concurring).

216

wrongdoers, courts must be willing to enforce it. I would do so here, and I therefore dissent.

ROSELLINI, J., concurs with UTTER, J.

Petition for rehearing denied April 30, 1975.