

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE NOV 27 2013

*Madsen C.J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on 11/27/13

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 86214-1 |
| Respondent, | |
| v. | EN BANC |
| DARA RUEM, | Filed    NOV 27 2013 |
| Petitioner. | |

STEPHENS, J.—We are asked to determine whether law enforcement officers must expressly advise a person of his or her right to refuse entry into a home—i.e., provide *Ferrier*[1] warnings—when the officers seek to execute an arrest warrant. We hold that *Ferrier* warnings are not required in this instance, though any consent obtained must be voluntary under the totality of the circumstances.

On the facts of this case, we conclude that Pierce County sheriff's deputies unlawfully entered Dara Ruem's mobile home in an attempt to execute an arrest warrant for Ruem's brother, Chantha Ruem. The deputies lacked probable cause

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 115-16, 960 P.2d 927 (1998).

to believe Chantha was present, and Ruem revoked his initial consent to the entry. Thus, the evidence recovered from the search of the home was illegally obtained and unlawfully admitted. We reverse the Court of Appeals and vacate Ruem's conviction.

### FACTS AND PROCEDURAL HISTORY

Over a period of several months in 2008, Pierce County sheriff's deputies attempted to execute an arrest warrant for Chantha. The address on the warrant was 10318 East McKinley Avenue. Two dwellings—a house and a mobile home—sat on the property. The mobile home was located adjacent to the house.

In March 2008, Chantha's father allowed Deputy Jeff Reigle into the house and showed him Chantha's room. Chantha's girl friend told Reigle that Chantha was not there. Reigle identified one of the cars parked in the driveway as registered to Chantha. Reigle did not encounter Chantha that day.

Reigle surveilled the McKinley Avenue address intermittently over the next few months. Chantha's car was often at the property. The only person Reigle observed driving the car was Chantha's girl friend. Reigle encountered Chantha's brother, David, at the mobile home, and David told him that Chantha was in California. On one occasion, Reigle made a traffic stop of a vehicle leaving the property. The driver did not know who Chantha was but told Reigle that David was at the mobile home. Reigle never saw Chantha at the McKinley Avenue address.

On the evening of June 4, 2008, Reigle and a team of deputies again attempted to serve the warrant for Chantha. Reigle went to the house to ask for Chantha, while Deputy Kevin Fries and Sergeant Thomas Seymour went to the mobile home. Ruem answered Fries' knock on the front door of the mobile home and told Fries that Chantha was not there. Fries asked for Ruem's identification because Ruem resembled photographs that Fries had seen of Chantha. Ruem told Fries that he lived in the mobile home with his brother; Fries assumed that Ruem meant Chantha.[2]

Ruem identified Chantha's car, which was parked on the property, but told Fries that Chantha had moved to California and bought a new car. Fries informed Ruem that he was going to go inside to look for Chantha and asked Ruem "if that was okay." Verbatim Report of Proceedings (VRP) (Dec. 10, 2008) at 33. Ruem initially agreed but stopped the deputies as they started to cross the threshold, saying, "'Now is not a good time.'" *Id.* at 33, 38. At this point, Fries and Seymour could smell burnt marijuana. Fries assured Ruem that they were not interested in arresting him for personal use of marijuana and then entered the mobile home.

Fries and another deputy searched the mobile home while Seymour stayed with Ruem in the living room. The deputies testified they were looking for Chantha, and they did not open drawers or spaces too small to hide a person. In

---

[2] Ruem claimed that he told the deputies that Chantha did not live in the mobile home and that he had another brother named David who lived with him in the mobile home. However, the judge who heard the suppression motion did not credit Ruem's testimony. The facts recited here are consistent with the court's findings.

the kitchen, Fries spotted several small marijuana plants. The plants were visible from the living room. Seymour arrested Ruem and informed him of his *Miranda*[3] rights. Seymour then called for a search warrant. In the process of looking for identifying features on the outside of the mobile home, Seymour discovered more marijuana plants. The deputies did not find Chantha in the mobile home or in the main house.

Later that same day, deputies from the Pierce County sheriff's special investigations unit executed the search warrant at the mobile home. They found significant amounts of contraband, including more than 100 marijuana plants in various stages of growth, equipment associated with growing and processing marijuana, several packages of marijuana throughout the mobile home, a DVD (digital video disk) labeled "'High Times Ultimate Grow,'" and more than $4,700 in cash. Clerk's Papers (CP) at 3. They also found a semiautomatic handgun.

*Procedural History*

Ruem was charged with one count each of manufacturing marijuana while armed with a firearm, possession of marijuana with intent to deliver while armed with a firearm, and unlawful possession of a firearm. He moved to suppress all evidence from the search, arguing that the deputies failed to advise him of his right to refuse their entry and did not have probable cause to believe that Chantha was present on June 4, 2008. The trial court denied the motion on the ground that the

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

warrant for Chantha's arrest authorized the deputies' presence in the home and the marijuana plants were in plain view.

Ruem appealed his subsequent jury conviction, and the Court of Appeals affirmed. The court held that the search was valid because Ruem consented to the entry and the deputies were not required to provide *Ferrier* warnings in seeking to execute the arrest warrant on Chantha.[4] *State v. Ruem*, noted at 162 Wn. App. 1009, slip op. at 6-9 (2009). We granted Ruem's petition for review. *State v. Ruem*, 172 Wn.2d 1006, 268 P.3d 944 (2011).

## ANALYSIS

Constitutional protections of privacy are strongest in the home. U.S. CONST. amend. IV; WASH. CONST. art. I, § 7; *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) ("the Fourth Amendment has drawn a firm line at the entrance to the house"); *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994) ("the home receives heightened constitutional protection"). Warrantless searches of the home are unreasonable under both the federal and state constitutions unless pursuant to a recognized exception. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Exceptions to the warrant requirement are carefully drawn and jealously guarded. *Id.* Plain view is one of these exceptions. *Id.* "A plain view search" occurs when law enforcement officers "(1) have a valid justification to be in an otherwise protected area and (2) are immediately able to

---

[4] The Court of Appeals also affirmed the firearm enhancements on Ruem's sentence. Given our disposition of this case, we do not address Ruem's challenge to his sentence.

realize the evidence they see is associated with criminal activity." *State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007). The question here is whether the deputies' presence was lawful when they observed the evidence that supported the search warrant for the mobile home. *See* CP at 207-08.

The State asserts the deputies' presence inside the mobile home was justified by (1) the valid arrest warrant for Chantha and (2) Ruem's consent. Br. of Resp't at 20, 25-26. In the alternative, the State argues that the search warrant was adequately supported by the smell of marijuana and that we should uphold the warrant under the independent source doctrine. Suppl. Br. of Resp't at 2-5. We will discuss each of these arguments in turn.

## A. The Arrest Warrant

Whether the arrest warrant for Chantha justified the deputies' entry into Ruem's mobile home hinges on whether the deputies had probable cause to believe that Chantha both resided there and was present on the evening of June 4, 2008.

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603. An arrest warrant allows law enforcement officers the limited power to enter a residence for an arrest where (1) the entry is reasonable, (2) the entry is not a pretext for conducting other unauthorized searches or investigations, (3) the officers have probable cause to believe the person named in the arrest warrant is an actual resident of the home,

and (4) the named person is actually present at the time of entry.[5] *Hatchie*, 161 Wn.2d at 392-93. The parties do not dispute the first two elements. But Ruem argues that the deputies did not have probable cause to believe that Chantha was a resident of the mobile home or that Chantha was present that evening. Pet. for Review at 13-16.

Our opinion in *Hatchie* is instructive. There, law enforcement officers had an arrest warrant for Eric Schinnell, whom they pursued after observing him purchasing precursor materials for the manufacture of methamphetamine. 161 Wn.2d at 393. Officers lost sight of Schinnell but found his truck parked in the driveway of Raymond Hatchie's duplex and a second car registered to Schinnell parked on the front lawn. *Id.* Both the vehicle registration and the arrest warrant listed a different address for Schinnell. *Id.* at 404. When questioned, one neighbor thought Schinnell lived in the house and had seen him there earlier that day and another often saw Schinnell there. *Id.* at 393. A bystander also told the officers that if Schinnell's truck was there, so was Schinnell. *Id.* Officers then approached the house and knocked on the door. *Id.*

Answering the knock, a resident of the duplex who had been living with Hatchie for three months told officers that he believed Schinnell was "'home'" and that Schinnell had been there "'off and on'" for the last two months. *Id.* at 393-94.

---

[5] The analysis is similar under both the Fourth Amendment and article I, section 7, even though the unique language of article I, section 7 generally provides greater protection of individual privacy. *See Hatchie*, 161 Wn.2d at 396-97 (noting both this court and the United States Supreme Court recognize that "the sanctity of the home is perhaps most deserving of constitutional protection").

Officers entered the duplex and found Schinnell hiding. *Id.* at 393. Based on their observations during the search, officers obtained a warrant to search Hatchie's residence for contraband. *Id.* at 394. We held that the arrest warrant provided a legitimate occasion for the officers' plain view observations; however, we cautioned that the facts of the case were "barely enough to suggest to a reasonable person" that the subject of the arrest warrant actually lived in the defendant's residence. *Id.* at 405.

The trial court here concluded that "the deputies had a reasonable basis to believe that Chantha Ruem was at the residence on June 4, 2008, based on [his] father's statement that Chantha resided there and the fact that Chantha Ruem's vehicle was there and had been used continuously and recently." CP at 209. This is insufficient, as the standard under *Hatchie* is probable cause, not a reasonable basis. 161 Wn.2d at 404.

Probable cause requires more than suspicion or conjecture. It requires facts and circumstances that would convince a reasonably cautious person. *Id.* On these facts, we cannot conclude that the deputies had information that would convince a reasonably cautious person that Chantha was either in residence or present at the home on the evening in question. It is true that the McKinley Avenue address was Chantha's address of record, but deputies had no current information that Chantha lived there. Unlike in *Hatchie*, where reports of Schinnell's presence were recent and consistent, here it had been several months since Chantha's father told the deputies Chantha lived there. VRP (Dec. 10, 2008) at 13. Additionally, deputies

-8-

had reports from two people that Chantha had moved to California, *id.* at 15, 32, and the only independent witness interviewed did not even know who Chantha was.[6] *Id.* at 16-17. Deputies here never encountered Chantha on the property. VRP (Feb. 19, 2009) at 97-98, 118; VRP (Feb. 23, 2009) at 225. Fries and Seymour both testified that they had no way of knowing the last time Chantha was at the address. VRP (Feb. 19, 2009) at 98, 118.

Even if we assume that the deputies had probable cause to believe Chantha resided at the McKinley Avenue address because it was his address of record, the constitution also requires probable cause to believe that the subject of the arrest warrant is actually present *at the time of entry*. *Hatchie*, 161 Wn.2d at 392-93. The State argues that the deputies had probable cause to believe that Chantha was present because his car was parked there. Br. of Resp't at 24. In *Hatchie*, we held that the presence of two cars registered to Schinnell, including one that he was driving while officers pursued him, provided probable cause that Schinnell resided at the duplex. 161 Wn.2d at 405.

But here, in contrast to *Hatchie*, the only information deputies had was that the car was registered to Chantha. At the same time, they knew Chantha's girl friend lived at the property and drove the car, and they were told by family

---

[6] The deputies did not believe statements by family members that Chantha was not present. VRP (Dec. 10, 2008) at 33, 52. Certainly an officer's impressions of an individual's truthfulness may be relevant to a probable cause determination. But here, with no other evidence corroborating the deputies' suspicions, and given that the deputies had visited the McKinley Avenue address several times without encountering Chantha, suspected misinformation on the part of Chantha's family does not amount to probable cause.

members that Chantha left the car behind when he moved to California and bought another car. VRP (Dec. 10, 2008) at 15, 32. Deputies never encountered Chantha on the days that his car was at the address, and they observed his girl friend driving the car. *See id.* at 13, 15; CP at 206. Given these circumstances, we hold that the deputies did not have probable cause to believe that Chantha was actually present at the time the arrest warrant was executed. As a result, we hold that the arrest warrant did not authorize the deputies to enter Ruem's mobile home.

## B. Consent

Because the State cannot rely on Chantha's arrest warrant to justify its entry into Ruem's home, we must consider the Court of Appeals' conclusion that Ruem consented to the entry. Ruem argues that because the deputies did not advise him he was free to withhold consent to enter—i.e., provide a *Ferrier* warning—the consent was per se involuntary. *See* Pet. for Review at 9-13. Alternatively, he argues that consent was not voluntarily given under the totality of the circumstances. We must first address the threshold question of whether a *Ferrier* warning was required; if it was required, we need not consider the parties' additional arguments concerning the validity of the entry and subsequent search.

### *Ferrier* Warning

In *Ferrier*, we considered whether our state constitution affords greater protection than the Fourth Amendment against warrantless entry into the home

during a "knock and talk."[7] *Ferrier*, 136 Wn.2d at 115. Officers had information that Debra Ferrier was growing marijuana in her home, but lacked probable cause to secure a warrant. *Id.* at 106-07. Officers knocked on her door and asked permission to search the home for marijuana plants but did not tell Ferrier that she had a right to refuse consent. *Id.* at 108-09. We held that under article I, section 7, such a "knock and talk" procedure is inherently coercive and law enforcement officers must inform the subject of the right to refuse consent to search before entering the home. *Id.* at 115-16.

We articulated the limits of *Ferrier* in *State v. Bustamante-Davila*, 138 Wn.2d 964, 983 P.2d 590 (1999). In that case, officers accompanied an immigration and naturalization service agent to the home of Bustamante-Davila to serve a deportation order. *Id.* at 969. Bustamante-Davila consented to the agent's entry and the officers followed the agent into the house when Bustamante-Davila stepped back from the door. *Id.* at 965-69. While there, officers observed an unlawful firearm, which led to a conviction. *Id.* at 969-70. On review, we held that *Ferrier* did not apply because the officers had not entered the home to search for contraband without a search warrant. *Id.* at 984.

We subsequently reaffirmed the limitations on the *Ferrier* rule. In *State v. Williams*, 142 Wn.2d 17, 27, 11 P.3d 714 (2000), we held that *Ferrier* did not

---

[7] In a "knock and talk" procedure, officers "'go to the door, knock on the door, make contact with the resident, ask if [they] can come in to talk about whatever the complaint happens to be.'" *Ferrier*, 136 Wn.2d at 107 (quoting one of the officers' testimony).

apply where a homeowner granted a law enforcement officer access to his home to verify the identity of his guests. In *State v. Vy Thang*, 145 Wn.2d 630, 635-37, 41 P.3d 1159 (2002), we held that failure to give *Ferrier* warnings did not vitiate consent where police entered a house to serve arrest warrants on two individuals in the home. Finally, in *State v. Khounvichai*, 149 Wn.2d 557, 559, 69 P.3d 862 (2003), we reiterated that *Ferrier* warnings "are required only when police officers seek entry to conduct a consensual search for contraband or evidence of a crime."

This case follows in the vein of *Bustamante-Davila*, *Williams*, *Thang*, and *Khounvichai*. The deputies did not seek Ruem's consent in order to circumvent the requirements of the search warrant process. The mobile home was of interest to them because they suspected Chantha lived there and they had a warrant for his arrest. The deputies did not "seek entry to conduct a consensual search for contraband or evidence of a crime." *Khounvichai*, 149 Wn.2d at 559. In this instance a *Ferrier* warning was not required. As in *Williams*, 142 Wn.2d at 27-28, we reject the invitation to "adopt a bright-line rule requiring *Ferrier* warnings whenever police seek entry into a home based on the consent of the occupant." Br. of Amicus Curiae Am. Civil Liberties Union (ACLU) at 2. We instead confirm that *Ferrier* warnings apply when police conduct a "knock and talk"; they were not required here.

Because we reject Ruem's invitation to hold that his consent to the deputies' entry was *per se* invalid under *Ferrier*, we must address his alternative argument

-12-

that even if *Ferrier* warnings were not required, he did not voluntarily consent to the entry under the totality of the circumstances.[8]

### *Totality of the Circumstances, Voluntariness, and Withdrawal of Consent*

Outside of the *Ferrier* context, we employ a totality of the circumstances test to determine whether consent to enter has been given voluntarily. *Thang*, 145 Wn.2d at 636. This test derives from the Supreme Court's Fourth Amendment jurisprudence. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Shoemaker*, 85 Wn.2d 207, 211-12, 533 P.2d 123 (1975). The factors considered are (1) the education and intelligence of the consenting person; (2) whether *Miranda* warnings, if applicable, were given prior to consent; and (3) whether the consenting person was advised of his right not to consent. *Schoemaker*, 85 Wn.2d at 212. No single factor is dispositive, but consent granted "only in submission to a claim of lawful authority" is not considered voluntary. *Schneckloth*, 412 U.S. at 233 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968)); *State v.*

---

[8] The concurrence suggests that our holding on the *Ferrier* question is dicta, presumably because we reverse Ruem's conviction on other grounds. Concurrence at 1, 6. But, in similar contexts, we have long recognized that a holding rejecting a *per se* argument before addressing other fact-specific arguments is not dicta. *See, e.g., State ex rel. Lemon v. Langlie*, 45 Wn.2d 82, 89-90, 273 P.2d 464 (1954). Here, it is only because we reject Ruem's *per se* argument under *Ferrier* that we address whether his consent was voluntary under the totality of the circumstances as well as other questions. Our sequencing is consistent with the approach we often follow when addressing a number of cascading arguments raised to challenge a conviction. *See, e.g., Thang*, 145 Wn.2d at 636-49 (holding that a *Ferrier* warning was not required, but reversing Thang's conviction on the grounds that the trial court erroneously admitted evidence of prior bad acts).

-13-

*O'Neill*, 148 Wn.2d 564, 579, 62 P.3d 489 (2003). Consequently, a court may weigh any express or implied claims of police authority to search. *State v. Reichenbach*, 153 Wn.2d 126, 132, 101 P.3d 80 (2004).[9]

Consent, once voluntarily given, may be withdrawn. A person consenting to a search has the right to restrict or revoke that consent at any time. *Ferrier*, 136 Wn.2d at 118; *see also United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) (A suspect is "free . . . to delimit or withdraw his or her consent at anytime."); *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents.").

Here, even if Ruem's initial consent was validly obtained, it appears he revoked that consent almost immediately.[10] Fries and Seymour acknowledge that, shortly after giving consent and before allowing deputies to completely cross the threshold of the mobile home, Ruem said, "No. This is not a good time." VRP

---

[9] Because we decline to require *Ferrier* warnings every time police seek entry into the home, the ACLU asks us to require them any time the police seek entry to conduct a warrantless search, regardless of whether that search is for a person or contraband. Br. of ACLU at 16-18. The ACLU suggests that any search carries with it a serious invasion of privacy. In response, we note that the totality of the circumstances test includes consideration of both coercion and consent in its multifactor test. The inapplicability of *Ferrier* warnings in some cases does not mean law enforcement has leave to disregard individual privacy rights.

[10] Though Ruem did not raise an argument concerning the revocation of his consent below, *Ruem*, slip op. at 9 n.11, it appears at certain points in his briefing before this court. Pet. for Review at 7 (noting in his fact section that he "retracted consent"); Suppl. Br. at 11 (arguing that "Ruem clearly withdrew his consent and at that moment the search should have discontinued"). Because a claimed revocation is so integral to the question of whether consent was voluntary we consider Ruem's revocation claim not as a late-raised issue, but as part of his argument that consent was not voluntary.

-14-

(Dec. 10, 2008) at 33, 54. The trial court found that Ruem had "changed his mind." CP at 207. We therefore conclude that the deputies did not have Ruem's voluntary consent to enter his home. And because, as previously explained, the arrest warrant they carried did not justify their presence inside the residence, their plain view observation of contraband from inside the home cannot form the basis for probable cause supporting the later-executed search warrant.

We therefore must address the State's alternative argument that the independent source rule justifies the later-executed search warrant.

### D. Independent Source Rule

The State argues that even if the illegally viewed evidence is not considered, the smell of burnt marijuana alone provides an independent source of probable cause to uphold the search warrant. *See* Suppl. Br. of Resp't at 3-4. We do not agree.

Evidence obtained in violation of the privacy protections of the Fourth Amendment or article I, section 7 must be excluded. *State v. Afana*, 169 Wn.2d 169, 179-80, 233 P.3d 879 (2010). The United States Supreme Court has recognized several exceptions to the exclusionary rule, but "[u]nlike its federal counterpart, Washington's exclusionary rule is 'nearly categorical.'" *Id.* at 180 (quoting *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009)). Article I, section 7 includes no express limitations on an individual's right to privacy. *Id.* While the exclusionary rule under the Fourth Amendment is meant to deter

unlawful police action, our state's exclusion rule serves primarily to protect an individual's right to privacy. *Id.*

One of the few exceptions that we recognize is the independent source rule, under which a search warrant obtained with unlawfully seized evidence may still be valid if the information that remains after excluding the improper information independently provides probable cause. *Winterstein*, 167 Wn.2d at 633. Significantly, the lawfully gained information must be genuinely independent of the illegal search. *State v. Gaines*, 154 Wn.2d 711, 721-22, 116 P.3d 993 (2005) (citing *Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) as controlling authority).

The State argues that the smell of marijuana may provide probable cause to search a house. Suppl. Br. of Resp't at 2 (citing *State v. Fry*, 168 Wn.2d 1, 228 P.3d 1 (2010) (suggesting the smell of marijuana wafting over a threshold provides probable cause to support a search warrant)). Even so, it is not clear from the record that the deputies' detection of the odor of burnt marijuana was independent of their illegal entry into the home. Fries testified that he detected the odor of marijuana once he "had already started to step over the threshold." VRP (Dec. 10, 2008) at 33. The trial court's findings do not establish that the marijuana smell was evident from outside the home. Thus, on this record, we cannot conclude that the deputies made any observations supporting probable cause prior to their illegal

entry. Accordingly, we cannot uphold the search warrant for Ruem's home under the independent source doctrine.[11]

## CONCLUSION

*Ferrier* warnings are not required when law enforcement officers seek consent to enter a home to execute an arrest warrant. Though *Ferrier* warnings were not required in this case, the deputies' entry was invalid because they lacked probable cause to believe Chantha would be in the mobile home and because Ruem's initial consent to the entry was revoked. The later-executed search warrant for Ruem's home was not supported by probable cause independent of information gathered during the unlawful entry. We therefore reverse the Court of Appeals, and vacate Ruem's conviction.

---

[11] We reject the State's reliance on Seymour's observation of starter plants outside the mobile home. These observations, made while walking the perimeter to look for identifying markings to better describe the home in the search warrant application, cannot stand on their own. The State claims that Ruem failed to raise a timely objection at the suppression hearing. Suppl. Br. of Resp't at 4-5. But the defense's challenge to the entry into the home and the search that followed encompassed a challenge to the observation of the starter plants.

_____

WE CONCUR:

_____
Madsen, C.J.

_____
Fairhurst, J.

_____

_____

_____
Owens, J.

_____

No. 86214-1


WIGGINS, J. (concurring in result)—Consent—to enter a contract, to have one's home searched, or for anything else—has no meaning unless the consenting party has realistic alternatives available. Therefore, consent is not voluntary unless the consenting party knows that he or she has the option to refuse. We recognized this truth in *State v. Ferrier,* 136 Wn.2d 103, 960 P.2d 927 (1998). But today, the lead opinion engages unnecessarily refuses to apply *Ferrier* here even while invalidating the home search at issue on other grounds. By limiting the scope of *Ferrier,* the lead opinion both creates dicta and grants the police uncalled-for power to search homes without a warrant. I write separately to explain how the lead opinion's cramped interpretation of *Ferrier* contravenes the robust protections we extend to the privacy of the home.

The right to privacy is enshrined in article I, section 7 of the Washington Constitution and is more expansive than its counterpart in the Fourth Amendment to the United States Constitution. Lead opinion at 15; *accord State v. Young,* 123 Wn.2d 173, 180, 867 P.2d 593 (1994) ("Const. art. 1, § 7 'clearly recognizes an individual's right to privacy with no express limitations'." (quoting *State v. Simpson,* 95 Wn.2d 170, 178, 622 P.2d 1199 (1980) (plurality opinion))); *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986). Furthermore, both federal and state privacy rights are at their strongest in the home. Lead opinion at 5 (citing *Young,* 123 Wn.2d at 185).

But as we recognized in *Ferrier*, 136 Wn.2d at 116, those rights are devoid of substance where a person does not know they exist. This is because any knock-and-talk procedure is "inherently coercive to some degree." *Id.* at 115. Confronted with a surprise show of government force and authority, most homeowners would, and in fact do, believe they have no choice but to accede to the search. *See id.* at 115-16 ("virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home"). This is exactly what happened in *Ferrier*. There, the defendant was confronted with four armed police officers in "raid jacket[s]"; she was frightened, nervous, and openly crying throughout the officers' search, and feared that her grandchildren would be taken away if she did not consent to a search of her home. *Id.* at 107-09. Ferrier could not have known she was entitled to refuse the officers entry or that she could exercise her right to exclude without fear of reprisal. And as we held, Ferrier's reaction to the police incursion was hardly unusual or unwarranted. Rather,

> the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search.

*Id.* at 115.

That is, the pressures inherent to a knock and talk create a risk that officers may circumvent constitutional search warrant requirements by playing on a homeowner's surprise, fear, or ignorance of the law. Therefore, we held that in the context of a knock and talk, a warning of the resident's right to refuse consent was a

2

"'threshold requirement for an intelligent decision as to its exercise.'" *Id.* at 117 (quoting *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

Significantly, in *Ferrier* we cited to the reasoning of the United States Supreme Court in adopting the requirement of *Miranda* warnings:

> The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

*Miranda*, 384 U.S. at 468-69 (footnote omitted). These considerations are no less important in Dara Ruem's case than in Miranda's and Ferrier's cases. The right to be free of government intrusion in the home is as important as the privilege against self-incrimination. It is so easy to advise a resident of the right to refuse police entry that there is no reason to engage in a case-by-case evaluation as to whether the resident was conscious of the right to refuse entry without a search warrant. And the warning reassures the resident that the police will honor the sanctity of the home and leave if consent is refused.

The knock and talk at issue in *Ferrier* is not the only police procedure that may be "inherently coercive." *Ferrier*, 136 Wn.2d at 115. Here, as in *Ferrier*, the police came to Ruem's own home, the core of his constitutional privacy protections.

3

Like in *Ferrier*, the police lacked probable cause to enter Ruem's home—as the lead opinion correctly holds—and sought Ruem's consent to entry in order to cure their lack of probable cause. As in *Ferrier*, the police did not merely ask politely to be let in, but relied on their power and authority as officers of the State. Deputy Kevin Fries came to Ruem's door with Sergeant Tom Seymour and produced an arrest warrant for Ruem's brother. Verbatim Report of Proceedings (VRP) (Feb. 19, 2009) at 79. It defies reason to think that presented with an arrest warrant, a lay person like Ruem would know the difference between arrest and search warrants, let alone question the absence of a *search* warrant. Alternatively, if Ruem was stunned by the circumstances, it is understandable that he would initially grant consent and then almost immediately revoke it. Whether through ignorance or through panic, Ruem granted consent that he clearly did not mean to give. So, as in *Ferrier*, the police benefited from Ruem's waiving rights that he either did not know he had or did not feel comfortable exercising.

The lead opinion seeks to distinguish *Ferrier* on the ground that the intent of the police was to arrest Ruem's brother Chantha, not to search for contraband or other evidence. Lead opinion at 12. But regardless of police intentions, a violation of Ruem's privacy interest occurred. In the course of searching for Chantha, the officers "walked through the entire mobile home" looking into Ruem's closets. VRP (Dec. 10, 2008) at 35. The lead opinion correctly notes that "[w]hile the exclusionary rule under the Fourth Amendment is meant to deter unlawful police action, our state's exclusion rule serves primarily to protect an individual's right to privacy." Lead Opinion at 15-16 (citing *State v. Afana*, 169 Wn.2d 169, 179-80, 233 P.3d 879

4

(2010)). If our constitution is concerned with protecting the defendant's privacy, rather than controlling police conduct, then a test keyed to the subjective intent of the police makes no sense.

The lead opinion's reliance on *State v. Khounvichai*, 149 Wn.2d 557, 69 P.3d 862 (2003); *State v. Vy Thang*, 145 Wn.2d 630, 41 P.3d 1159 (2002); and *State v. Williams*, 142 Wn.2d 17, 11 P.3d 714 (2000), is misplaced. In all of these cases, the defendant was a mere guest in another person's home. A guest cannot be said to have the same sacrosanct privacy interests in the home that we ascribe to the homeowner; indeed, we have established that "[a] guest's expectation of privacy may be vitiated by consent of another resident." *Thang*, 145 Wn.2d at 638 (citing *State v. Rodriguez*, 65 Wn. App. 409, 828 P.2d 636 (1992)). In contrast, Ruem was in his own home when the police contacted him and thus at the zenith of his constitutional privacy protections.

Similarly, the lead opinion's reliance on *State v. Bustamante-Davila*, 138 Wn.2d 964, 983 P.2d 590 (1999), is unavailing. In that case, the defendant neither expressly consented nor objected to the officers' entry. *Id.* at 981. Therefore, we held that Bustamante-Davila had implicitly consented to the police officers' entry and could not complain of a warrantless search. Unlike Bustamante-Davila, Ruem "almost immediately" objected to the officers' entry, lead opinion at 14, and so no inference of acquiescence can be drawn. Ruem made it clear that he did not want the officers in his home. If he had been given a meaningful opportunity to invoke his constitutional privacy rights and refuse the officers entry, he almost certainly would have exercised it.

5

I do not propose to expand *Ferrier* to every contact between citizens and police, nor to adopt a rule that would "unnecessarily hamper a police officer's ability to investigate complaints and assist the citizenry." *Williams*, 142 Wn.2d at 28. However, when the same homestead privacy interest as in *Ferrier* is violated, and when the same effect of circumventing constitutional warrant requirements is achieved, it makes little difference that the officers did not *mean* to circumvent article I, section 7 requirements. Inherently coercive police procedures that result in violations of core privacy interests are unconstitutional, under whatever name. *Ferrier* should be applied here, particularly because the lead opinion's result does not actually rely on its *Ferrier* analysis. While I agree with the lead opinion's result, I cannot agree with its stealth undermining of the homeowner's right to deny unwarranted entry by police.

I concur in result.

_____
Wiggins, J.

Johnson, J.

González, J.,

Chambers, J.P.T.

No. 86214-1

J.M. JOHNSON, J. (concurring in part, dissenting in part)—I agree with the lead opinion that *Ferrier*[1] warnings are not constitutionally required before law enforcement officers obtain consent for a search to enforce an arrest warrant.

Directly relevant to affirming Dara Ruem's conviction, the sheriff's deputies' separate detection of marijuana odors while outside the trailer in this case did not constitute a search within the meaning of the plain view exception to the search warrant requirement. Even if the deputies only smelled the marijuana while entering the trailer, their presence was legal. The trailer was the known residence of Ruem's brother, Chantha, the subject of an arrest warrant. I would affirm the Court of Appeals on all issues and uphold the conviction of Dara Ruem.

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998).

## I. PLAIN VIEW

The lead opinion properly recognizes our constitutional protections of privacy in the home found in article I, section 7. Lead opinion at 5. Constitutional principles do not compel courts to force police to ignore their senses when officers detect criminal activity. *State v. Hammond*, 24 Wn. App. 596, 598, 603 P.2d 377 (1979).[2] The plain view exception still applies when law enforcement officers "'(1) have a valid justification to be in an otherwise protected area and (2) are immediately able to realize the evidence they see is associated with criminal activity.'" Lead opinion at 5 (quoting *State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007)). Law enforcement officers are entitled to rely on their senses in making plain view determinations. *Hammond*, 24 Wn. App. at 598. When the police confront a person in a confined space who smells of a distinctive drug, there is no other explanation for the presence of the smell except for criminal drug possession occurring in plain view. *Id.*

The issue here is not whether the deputies were lawfully inside Dara Ruem's mobile home. Lead opinion at 6. The lead opinion has omitted the

---

[2] Although *Hammond* was limited by *State v. Grande*, 164 Wn.2d 135, 187 P.3d 248 (2008), it is not overruled. Instead, the *Grande* court declined to extend the "plain view" doctrine to authorize the search and arrest of multiple people occupying a vehicle that faintly smells of marijuana.

threshold question of whether the deputies were in an "otherwise protected area" when the plain view "search" (or "smell") occurred.[3] *Id.* at 5 (quoting *Hatchie*, 161 Wn.2d at 395). If the law enforcement officers are not intruding into a protected area where a reasonable expectation of privacy exists when officers discover contraband, a "search" has not actually occurred. *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981). A person may have a reasonable expectation of privacy in the smells emanating from his or her home. *State v. Ross*, 141 Wn.2d 304, 314, 4 P.3d 130 (2000). However, the privacy expectation does not protect what is readily apparent to law enforcement officers with legitimate business in areas of curtilage, including points of access to the home. *Seagull*, 95 Wn.2d at 902.[4] In this case, the deputies were outside the trailer on the front porch when they initially perceived the smell of drug contraband. They were lawfully within the curtilage of the trailer attempting to execute a separate arrest warrant (for Chantha, a different defendant with the same address).

---

[3] If the deputies heard a crying baby in a kidnapping case involving the baby, plain "hearing" would dictate the same result.

[4] It cannot be seriously argued that the police are not lawfully present at the front door of a home bearing the address of record for the object of an arrest warrant.

The trial court found as a matter of *undisputed* fact that "the deputies were standing *at* the front door to the mobile home and could smell marijuana in the air" and before that the officers smelled marijuana coming from Ruem's clothing. Clerk's Papers (CP) at 207 (emphasis added). This unchallenged finding of fact is a verity on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). The deputies testified that they initially smelled marijuana as they "started to step over the threshold." Verbal Report of Proceedings (Dec. 10, 2008) at 33. The "process of entering" had begun when the deputies smelled the marijuana. *Id.* at 38. The second deputy testified that the entry and smelling were simultaneous. *Id.* at 49.

Even defendant Ruem conceded that the deputies were "close enough to the inside of the trailer" to smell marijuana from the threshold. Pet. for Review at 7. The record of the testimony at the pretrial suppression hearing supports the court's finding that the deputies smelled marijuana prior to entry. The trial court drew inferences from the credibility of witnesses and concluded that the marijuana smell occurred first. Therefore, on this record, the smell of marijuana was plain *before* the deputies entered the trailer. The State has met its burden of proving that the plain view exception was satisfied.

Because the rest of the court assumed incorrectly that the deputies entered the trailer before smelling the marijuana, I now turn to whether there was additional justification for the deputies' presence inside the trailer from which marijuana was smelled and seen.

## II. JUSTIFIED PRESENCE

A.   The Arrest Warrant

The police are lawfully present while executing an arrest warrant when (1) they are at the suspect's home and (2) there is reason to believe the suspect is within. *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). The deputies were serving a felony arrest warrant naming Ruem's brother, Chantha, at the address in question.[5] The trailer and house shared one address and were on the same lot. CP at 209. Several members of the family said that Chantha lived on the property. Chantha still had belongings on the property, often including his automobile. Given this evidence, it was reasonable for the police to conclude that Chantha still resided on the property at least and that his family was attempting to conceal him. When the police have an arrest warrant listing a name and address, they are entitled to rely on the document that is presumed supported by

_____

[5] Chantha himself provided this address as required before release on bail for drug charges. CP at 24.

probable cause. (Here, the warrant and records all showed this address as Chantha's residence.)

The use of *Hatchie* in the lead opinion is misplaced. Lead opinion at 7-8. The *Hatchie* court held that two witnesses stating the suspect lived in the house was "barely enough to suggest to a reasonable person" that the suspect actually lived at the house in question. 161 Wn.2d at 405. But in *Hatchie* the object of the arrest warrant was "merely a guest, not a resident." *Id.* at 392. Here, Chantha had listed the address as his residence for many purposes before it appeared on the warrant. The presence of Chantha's belongings in the house and automobile out front further indicates that his residence continued at the time of the search.

The question of Chantha's actual presence is closer, but the trial court decided in favor of the State. The trial court found, based on the credibility of the deputies' testimony and the incredible and unreasonable testimony of Ruem, that the deputies had a reasonable basis to conclude Chantha was present when they executed the warrant. Probable cause was based on Chantha's father's statement to the deputies, the fact that Chantha's car was regularly parked on the property, and the fact that other family members were acting suspiciously and gave conflicting accounts when questioned

about whether and when Chantha was on the property.[6] CP at 209. These facts provide more than mere suspicion on the part of the deputies. It was reasonable for the deputies to conclude that Chantha was in the trailer bearing his address of record when his registered vehicle was parked on the property and cohabitant family members gave conflicting accounts of his whereabouts, often stating that Chantha was still residing at this site. (The only home address he had provided at all relevant times.)

B.    *Ferrier* Warnings and Consent

I agree that the deputies "did not seek Ruem's consent in order to circumvent the requirements of the search warrant process." Lead opinion at 12 (collecting cases). The concurrence overstates the power of "a surprise show of government force and authority" to overbear an ordinary person's free will. Concurrence at 2. *Ferrier* is distinguishable on its facts because in that case the police were attempting to circumvent the warrant requirement specifically because "they believed that they could not obtain a search warrant." *State v. Ferrier*, 136 Wn.2d 103, 107, 960 P.2d 927 (1998). Here, Ruem was not the direct object of the deputies' action and motivation.

---

[6] The lead opinion characterizes these facts as mere "impressions of [the family members'] truthfulness." Lead opinion at 9 n.6. However, when one person says Chantha was there and another says he is not, at least one of those family members is not telling the truth. Lying to the police is supportive of probable cause. *Sibron v. New York*, 392 U.S. 40, 88 S. Ct. 1889, 1904, 20 L. Ed. 2d 917 (1968).

The deputies sought Chantha under a court's arrest warrant. Accordingly, I believe that the deputies obtained consent to search the trailer for Chantha notwithstanding the absence of *Ferrier* warnings. I concur with the *Ferrier* warning analysis in part B of Justice Stephens' opinion.

I concur in the lead opinion's *Ferrier* holding, and the rule in this case remains that law enforcement officers' failure to inform one resident of a home about the right to refuse consent to execute an arrest warrant does not render that consent per se invalid. Instead, a reviewing court will continue to evaluate the totality of the circumstances.

In Washington, "[w]hen there is no majority opinion, the holding is the narrowest ground upon which a majority agreed." *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 532 n.7, 242 P.3d 866 (2010).[7] Therefore, when

---

[7] I recognize that the United States Supreme Court uses a different rule: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who *concurred* in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977) (emphasis added) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)). I see no reason for this court to follow that rule because of the significant differences between this court and our federal counterpart. We are elected directly by the people rather than appointed. We interpret two constitutions, not just one. Our oath requires us to faithfully and diligently perform the duties of our office. Just because my conscience will not allow me to sign an opinion that reverses Ruem's conviction does not invalidate my opinion that Justice Stephens' *Ferrier* holding correctly states the law in Washington.

the rationale for a dissent more closely aligns with the lead opinion on a certain issue, that rationale forms the court's holding as to that issue.

C.    Ordinary Consent and the Totality of the Circumstances

The deputies asked for permission to search the trailer and Ruem initially consented. The lead opinion correctly states the factors we should consider in analyzing the voluntariness of consent. Lead opinion at 13. These factors are "(1) the education and intelligence of the consenting person; (2) whether *Miranda*[8] warnings, if applicable, were given prior to consent; and (3) whether the consenting person was advised of his right not to consent." *Id.* (citing *State v. Shoemaker*, 85 Wn.2d 207, 211-12, 533 P.2d 123 (1975)). However, I think these factors weigh in favor of finding voluntary consent here.

Ruem was intelligent enough to know how to run a sophisticated grow operation in his home. He had enough education to give evasive answers to the deputies and later attempted to limit that consent shortly after it was given. The first factor weighs against Ruem. The second and third factors did not apply here. *Miranda* warnings were not applicable because Ruem was not under arrest when he gave consent. Ruem had no right to refuse

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

consent because the deputies had authorization to search the trailer pursuant to the arrest warrant. *See supra* pp. 3-5. Thus, the consent was voluntary.

There is no fourth factor regarding the length of time consent was granted before it was withdrawn. Mere moments existed between the time Ruem consented and the time Ruem withdrew consent. But those moments here require an important legal distinction. After consent, but before withdrawal, the deputies smelled marijuana in the trailer. Once in the trailer lawfully, the police now had probable cause to believe criminal activity was occurring in their presence. Law enforcement officers have neither duty nor legal requirement to ignore their sense of smell when it reveals that criminal activity is afoot. *Hammond*, 24 Wn. App. at 598. *Hammond* still stands for this proposition. *Grande* merely sought to prohibit law enforcement officers from arresting a car full of people just because they smell marijuana inside, which could originate from one person or even the car itself. *Grande*, 164 Wn.2d at 146. In this case, no one else was in the trailer so the only "*individual* privacy" concerns at stake here are those of Ruem. *Id.* The concerns raised by *Grande* are not present here.

D.    Independent Source Rule

Until this year, marijuana consumption (manufacture or distribution) was clearly criminal activity in Washington and still is criminal activity under the federal laws of the United States. The activity at issue in this case was commercial manufacture of marijuana, which is still illegal without a license. Because the police detected the distinct odor of marijuana while entering the trailer at the defendant's invitation, this also was sufficient to meet the independent source rule. The smell of marijuana has no other explanation than the presence of marijuana. Therefore, the smell of marijuana was sufficient to substantiate the probable cause that eventually gave rise to the search warrant. *See supra* pp. 2-3, 7.[9]

The United States Supreme Court has declined to extend the plain smell doctrine to smells detected by dog. *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). However, the justification for that rule is that a smell by a service dog is more akin to a search than smells detectable by humans that are in plain view because the dog is an "instrument" that extends the senses of the police. *Id.* at 1424. The odor of marijuana may provide probable cause to seek a warrant but does not,

_____

[9] The search following issuance of the warrant uncovered more marijuana plants and lighting consistent with a grow operation.

without exigent circumstances, justify a warrantless search. *State v. Tibbles*, 169 Wn.2d 364, 370, 236 P.3d 885 (2010).[10] In this case, because the deputies smelled the marijuana without assistance while entering the trailer at Ruem's invitation, the smell itself did not constitute an illegal search. They then obtained a search warrant that had several bases not violative of Ruem's constitutional rights and so the evidence should not be suppressed.

## III. CONCLUSION

The lead opinion and concurrence mistakenly assume that a search occurred. Because the deputies entered Ruem's trailer while smelling the marijuana, the smell itself did not constitute a search. The trial court found this as the trier of fact during the pretrial suppression hearing. This fact was unchallenged on appeal. Because the deputies were standing outside the trailer when they detected criminal activity with their sense of smell, Ruem's constitutional rights were not violated. We should affirm the Court of Appeals and hold that *Ferrier* warnings are not required before obtaining consent to search a home when consent is not obtained merely to circumvent

---

[10] Based upon the discovery of marijuana in Ruem's trailer, the deputies ultimately did obtain a search warrant. The smell itself was sufficient probable cause to justify the warrant. Perhaps the plants in the kitchen could be suppressed because they were discovered during a search without exigent circumstances; however, the grow room was only opened after obtaining the warrant.

the warrant requirement. The conclusions above dictate that Ruem's conviction must be upheld. Because the court does not do so, I dissent.