# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47025-0-II |
| Respondent, | |
| v. | |
| DYLAN JAMES WOMER, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Dylan James Womer was convicted of vehicular homicide for driving while intoxicated, recklessly, and with disregard for the safety of others. Womer appeals his conviction and sentence, arguing that (1) the superior court erred by admitting the results of his blood test because (a) the superior court's CrR 3.6 findings of fact are not supported by substantial evidence and (b) exigent circumstances did not exist under *Missouri v. McNeely*[1]; (2) he received ineffective assistance of counsel when (a) counsel failed to move to suppress crime scene and autopsy photographs of the victim, and (b) when counsel failed to move to suppress the results of his blood alcohol test on the basis of *State v. Figeroa Martines*[2]; and (3) the trial court erred by imposing legal financial obligations without inquiring into his current or future ability to pay. We disagree and affirm.

---

[1] 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013).

[2] 182 Wn. App. 519, 331 P.3d 105 (2014), *rev'd*, 184 Wn.2d 83, 355 P.3d 1111 (2015).

FACTS

On April 25, 2013, around 12:30 a.m., Dylan Womer was driving in Thurston County, Washington, with his friend riding in the front passenger seat. The vehicle crashed, striking a tree on the passenger side. The vehicle was "nearly ripped in half." 2 Verbatim Report of Proceedings (VRP) at 205. The passenger died at the scene, his right arm amputated and his right leg partially amputated. Womer was transported to the hospital.

Washington State Trooper Daniel Walwark was dispatched to the scene of the collision and arrived at 12:48 a.m. Washington State Patrol Sergeant Jason Greer was also dispatched to the scene shortly after 1:00 a.m. While travelling from Tacoma to the scene, Sgt. Greer communicated with Trooper Walwark, and after getting Trooper Walwark's initial observations about the scene, instructed Trooper Walwark to go to the hospital to make contact with Womer and "keep an eye on" him. VRP (Dec. 9, 2013) at 12.

Trooper Walwark left the scene at between approximately 1:30 and 2:00 a.m. to make contact with Womer at the hospital. When Trooper Walwark got to the hospital, Womer's hospital room smelled like alcohol, Womer's eyes were "very bloodshot and watery," and Womer's speech was "repetitive, fast, fast rate of speech, and fairly slurred." 2 VRP at 212. Womer told Trooper Walwark that he had drunk "four to five shots of alcohol," and smoked methamphetamine and marijuana. 2 VRP at 214.

Sgt. Greer arrived at the scene of the collision at about 2:00 a.m. He observed "an alcohol bottle" and determined that the position of the deceased body indicated that the deceased person was the passenger in the car. VRP (Dec. 9, 2013) at 25. Sgt. Greer communicated his observations to Trooper Walwark between 2:00 and 2:30 a.m. After talking with Sgt. Greer, Trooper Walwark

2

instructed hospital staff to draw a blood sample from Womer for testing and placed Womer under arrest.

The State charged Womer with vehicular homicide by operating a motor vehicle: (a) while intoxicated, (b) in a reckless manner, or (c) with disregard for the safety of others. RCW 46.61.520(1)(a), (b), and (c). Womer pleaded not guilty.

A. PRETRIAL

1. Womer's First CrR 3.6 Motion to Suppress

Womer moved to suppress the results of the blood test, arguing that the results were inadmissible because officers had not obtained a warrant. Womer argued that under *Missouri v. McNeely*, a suspect's dissipating blood alcohol concentration does not constitute a per se exigent circumstance that justifies a warrantless search. The State argued that the totality of the circumstances, including Womer's dissipating blood alcohol concentration, constituted exigent circumstances.

At the suppression hearing, Sgt. Greer testified to the following events. Just after 1:00 a.m., Sgt. Greer was called to investigate a collision and was advised by his dispatcher that Trooper Walwark was at the scene. Sgt. Greer then called Trooper Walwark "to get some information prior to responding," but Trooper Walwark did not answer. VRP (Dec. 9, 2013) at 10. Trooper Walwark called Sgt. Greer back "about 10 or 15" minutes after 1:00 a.m. VRP (Dec. 9, 2013) at 10. Trooper Walwark told Sgt. Greer the collision involved a car hitting a tree and "[t]he car was kind of split in half," there was a deceased passenger, and that someone associated with the collision, a "possible driver," was being transported to a nearby hospital. VRP (Dec. 9, 2013) at 10, 14.

3

While driving to the scene of the collision, based on the information provided by his dispatcher, Sgt. Greer had the impression that the driver of the car was impaired and that Womer was the driver. However, before conducting his own investigation of the collision, Sgt. Greer did not believe he had enough evidence to apply for a warrant.

After arriving at the scene close to 2:00 a.m. and conducting his own investigation, Sgt. Greer believed he had sufficient probable cause to believe that Womer was the driver and that alcohol contributed to the collision. He found alcohol at the scene and the position of the body indicated that the deceased person was the passenger. Based on his own investigation, Sgt. Greer determined that probable cause existed for a warrant to take a blood sample from Womer. However, in Sgt. Greer's experience, "it would take the trooper maybe an hour or so to write the warrant. Depending on the judge's availability and what numbers are called, that could take another hour or so," sometimes taking "many hours" to reach a judge. VRP (Dec. 9, 2013) at 17-18. Sgt. Greer called Trooper Walwark between 2:00 and 2:30 a.m. to instruct him to obtain a blood sample from Womer without a warrant.

Trooper Walwark testified that he was first dispatched to the collision at 12:47 a.m., and he spoke with Sgt. Greer "about a half an hour after [he] arrived" at the scene of the collision. VRP (Dec. 9, 2013) at 40. When they spoke, Trooper Walwark reported to Sgt. Greer that he was at the scene of the collision, "it was a car versus tree collision; that there was one confirmed deceased individual on the scene, and there was another individual associated with the scene" being transported to a nearby hospital. VRP (Dec. 9, 2013) at 40.

Trooper Walwark was the only officer at the hospital. When Trooper Walwark made contact with Womer, he noticed the smell of alcohol in Womer's hospital room. Hospital staff

told Trooper Walwark that Womer suffered minimal injuries and was cleared to be discharged. Trooper Walwark spoke with Sgt. Greer, who was still at the scene of the collision, just before 2:30 a.m. Sgt. Greer told Trooper Walwark that he had established probable cause that Womer was the driver and instructed him to obtain a blood sample from Womer. Trooper Walwark then ordered the blood draw. To obtain a search warrant, Trooper Walwark would have gone to his patrol car, parked in the rear parking lot of the hospital, leaving Womer ready for discharge and without an officer present.

The trial court denied Womer's motion to suppress the results of the blood draw. The court found that

> [E]xigent circumstances did exist . . . to justify the warrantless blood draw based on the following facts: the time of day that the crash occurred; the time that had already elapsed [following] the fatal collision; the anticipated delay of approximately two hours before a search warrant could be obtained; the possibility that the defendant would have been discharged from the hospital if Trooper Walwark went to his patrol vehicle to prepare the search warrant affidavit.

Clerk's Papers (CP) at 266.

2. The Blood Tests

On April 30, 2013, the Washington State Patrol Toxicology Laboratory tested Womer's blood sample. The test results revealed blood alcohol concentration of 0.08 and a methamphetamine level of 0.23.

On August 14, in light of Division One's July 21, 2014 decision in *State v. Figeroa Martines*, 182 Wn. App. 519, 331 P.3d 105 (2014), *rev'd*, 184 Wn.2d 83, 355 P.3d 1111 (2015), the State moved, under CrR 4.7(b)(2)(viii), for an order authorizing the State to test Womer's "blood samples previously seized pursuant to exigent circumstances." Suppl. CP at 281. A

different Thurston County Superior Court judge granted the State's motion and authorized the re-test of Womer's blood. Womer's blood was re-tested, revealing a blood alcohol concentration of 0.071 and methamphetamine levels of 0.21.

3.    Womer's Second Motion to Suppress

In September 2014, Womer moved to suppress all evidence resulting from the blood draw in April 2013, including the April 2013 test and the September 2014 re-test pursuant to *Martines*. Womer argued that he was not read the "Implied Consent Warnings" that are statutorily required, and therefore, the evidence was inadmissible. CP at 124. The trial court denied Womer's motion to suppress. The parties agreed that the jury would not be informed that Womer's blood was tested twice.

4.    Crime Scene and Autopsy Photographs

The State sought to admit digital photographs of the victim at the crime scene and during the autopsy. Womer and the State agreed on the photos to be shown at trial. Womer stated:

> The photos at the scene where the victim was found, they are not terribly shocking, although they might shock some people. Some of the autopsy show the immediate cause of death was traumatic head injury . . . I don't have an objection to the State showing photos of the actual skull fracture, and, unfortunately, you cannot really see the skull fracture from the outside.
>
>      . . . It seems to me that the State is probably within its right, given its burden of proof, to show at least those photos because, like I said, it's difficult [to see]."

1 VRP (Dec. 8, 2014) at 12-13. The trial court asked Womer and the State whether there would be an issue of "shock of jurors." 1 VRP (Dec. 8, 2014) at 13. Womer responded: "that's what voir dire is about." 1 VRP (Dec. 9, 2014) at 14.

6

B.    TRIAL

The deputy coroner, testified that the victim's right arm was amputated, his sweat pants were ripped off, and his lower right leg was partially amputated. The forensic pathologist, testified that the victim's death was caused by blunt force trauma, using the various crime scene and autopsy photographs to explain her testimony.

Washington State Patrol Sgt. Michael Bassett testified about his investigation into the collision, including the collision reconstruction. Sgt. Bassett testified that based on the investigation and collision reconstruction, it is likely that Womer was driving "faster than . . . 61 to 77 miles [per] hour on the night of the collision." 3 VRP at 446.

Andrew Gingras, a forensic scientist at the Washington State Patrol Toxicology Laboratory, testified regarding the blood test.[3] Gingras testified that Womer's blood alcohol concentration was 0.071 plus or minus 0.0058. Gingras also testified to the effects of alcohol on the body, like affecting fine motor movement, gross motor skills, concentration, speech, and vision. Gingras further testified that based on Womer's blood levels of 0.21 milligrams per liter of methamphetamine, it is possible that Womer had recently consumed methamphetamine. Gingras described the effects of methamphetamine and that it often results in jerky motor control, restlessness, and affects reaction times and decision-making.

Womer testified that he was driving approximately 60 miles per hour and that he knew the posted speed limit varied between 35 and 40 miles per hour. Womer also testified that he and the victim smoked a small bowl of methamphetamine and drank about four to five shots of rum.

---

[3] There was no mention of two blood tests; the testimony was based on the second, September 2014 blood test.

The jury was instructed on three alternative methods of committing vehicular homicide—for operating a motor vehicle while intoxicated, in a reckless manner, or with disregard for the safety of others. The jury returned a special verdict finding Womer guilty under all three alternatives. The trial court sentenced Womer to 124 months of confinement and imposed mandatory legal financial obligations (LFOs). Womer appeals.

ANALYSIS

A.      THE BLOOD SAMPLE

Womer argues that (1) the trial court's findings of fact are unsupported by substantial evidence, and (2) the trial court erred by denying his motion to suppress the results of the blood test because exigent circumstances did not exist to justify taking a blood sample without a warrant under *Missouri v. McNeely*, 133 S. Ct. 1552. We disagree.

1.      CR 3.6 Hearing—Findings of Fact and Conclusions of Law

Womer argues that the trial court's findings of fact numbers 9, 13, 14, 20, and 21 are unsupported by substantial evidence.[4] We disagree.

We review a trial court's ruling on a motion to suppress evidence to determine whether substantial evidence supports the trial court's findings of fact and whether those findings, in turn, support the trial court's conclusions of law which we review de novo. *State v. Russell*, 180 Wn.2d 860, 866, 330 P.3d 151 (2014). Substantial evidence is evidence sufficient to persuade a fair-minded person of the finding's truth. *Russell*, 180 Wn.2d at 866. We treat unchallenged findings

---

[4] Womer challenges finding of fact number 16, but fails to offer any argument regarding his challenge. Therefore, we do not consider Womer's challenge to finding of fact 16. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

of fact as verities on appeal. *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158, *review denied,* 175 Wn.2d 1025 (2012). On issues of credibility, we defer to the trier of fact. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

        a.      Finding of Fact 9

Finding of Fact 9 reads: "At some point between 1:15 to 2:15 A.M., Trooper Walwark returned Sgt. Greer's telephone call and advised Sgt. Greer of his initial findings." CP at 264. Womer does not articulate the specific basis of his challenge to this finding; instead, Womer generally argues that "substantial evidence does not support the court's finding that this event occurred at 2:15 am." Br. of Appellant at 27-28.

Sgt. Greer called Trooper Walwark shortly after being dispatched to the scene at 1:00 a.m. Trooper Walwark did not answer, but he called Sgt. Greer back about 10 to 15 minutes after 1:00 a.m. Both Sgt. Greer and Trooper Walwark testified that during that call, Trooper Walwark told Sgt. Greer about his initial findings at the scene. Trooper Walwark testified that he left the scene between approximately 1:30 and 2:00 a.m. to make contact with Womer at the hospital, which was before Sgt. Greer arrived at the scene at about 2:00 a.m. Based on the officers' testimony, the evidence is sufficient to persuade a fair-minded person of the truth of the finding. Thus, the trial court's finding of fact 9 that Trooper Walwark advised Sgt. Greer of his initial findings between 1:15 and 2:15 a.m. is supported by substantial evidence.

        b.      Finding of fact 13 and 14

Womer's challenge to the findings is primarily focused on finding of fact 13 and 14. Finding of fact 13 reads:

> At approximately 2:15 A.M., Sgt. Greer, while still at the scene of the collision, contacted Trooper Walwark and advised Trooper Walwark that after his [Sgt. Greer] investigation, he believed that he had probable cause to believe that the individual at the hospital was the driver of the vehicle.

CP at 264. Finding of fact 14 reads:

> The court finds, based on the testimony presented, that probable cause was not developed until a few minutes prior to Sgt. Greer contacting Trooper Walwark at approximately 2:15 A.M.

CP at 264.

Womer claims that substantial evidence does not support the court's finding that Sgt. Greer and Trooper Walwark "spoke on the phone and determined to take blood" from Womer at approximately 2:15 a.m. and that officers did not establish probable cause to arrest until 2:15 a.m. Womer argues that the finding is unsupported because Sgt. Greer testified that "they had the 'impression' that [Womer] was the driver" and "impaired" by about 1:05 a.m. Br. of Appellant at 26, 28 (quoting VRP (Dec. 9, 2013) at 24).

Womer is correct that Sgt. Greer testified that officers suspected that Womer was the driver by 1:05 a.m. But, Sgt. Greer also testified that he did not believe he had enough evidence to apply for a warrant because the only information he had was from his dispatcher, and he had not arrived at the scene yet or conducted his own investigation. Sgt. Greer's impression that Womer was the driver at 1:05 a.m. is not the equivalent of Sgt. Greer establishing probable cause for a warrant at 1:05 a.m.[5] *See State v. Ruem*, 179 Wn.2d 195, 202, 313 P.3d 1156 (2013) ("Probable cause requires more than suspicion or conjecture.").

---

[5] To the extent that Womer is arguing that the officers should have applied for a warrant based on their impression that Womer was the driver, he fails to provide supporting authority and his claim fails. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

Sgt. Greer testified that he did not believe he had enough evidence to apply for a warrant until he arrived at the scene and conducted his own investigation at about 2:00 a.m. After he was able to conduct his own investigation of the scene, Sgt. Greer believed that Womer was the driver and that alcohol may have contributed to the collision. Sgt. Greer then called Trooper Walwark. Trooper Walwark testified that when Sgt. Greer called him just prior to 2:30 a.m., he was told that they had probable cause to believe that Mr. Womer was the driver and to take a blood sample from Womer. Thus, substantial evidence supports the trial court's finding that the officers established probable cause a few minutes prior to Sgt. Greer contacting Trooper Walwark at *approximately* 2:15 a.m. and that Sgt. Greer told Trooper Walwark at *approximately* 2:15 a.m. that he had probable cause to believe Womer was the driver of the vehicle.

Womer points to Sgt. Greer's testimony that he had decided to draw blood by "2:05" a.m. to demonstrate that the finding lacks substantial evidence. Br. of Appellant at 27 (quoting VRP (Dec. 9, 2013) at 26). To the extent that Womer is arguing that a discrepancy of 10 to 15 minutes does not fall within the time frame of "approximately 2:15 a.m.," his argument is unsupported by authority and fails. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); *see DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

        c.      Finding of Fact 20

Finding of fact 20 reads:

> In Sgt. Greer's experience, it takes approximately two hours from the time the State Patrol begins its process to put together an affidavit to the time that the search warrant is granted. Additionally, Trooper Walwark would have to physically leave the defendant unattended to go out to his patrol vehicle to access his computer to prepare the search warrant affidavit.

CP at 265.

Womer argues that substantial evidence does not support the trial court's finding that in Sgt. Greer's opinion it takes two hours to prepare an affidavit and get a search warrant. Br. of Appellant at 26, 28. We disagree.

Sgt. Greer testified that in his experience, "it would take the trooper maybe an hour or so to write the warrant. Depending on the judge's availability and what numbers are called, that could take another hour or so." VRP (Dec. 9, 2013) at 17. Sgt. Greer also testified that, in his experience, it has taken "many hours" to reach a judge.[6] VRP (Dec. 9, 2013) at 18.

Thus, based on the testimony presented at the CrR 3.6 hearing, the trial court's finding of fact 20 is supported by substantial evidence. We hold that Womer's challenge to this finding fails.

> d.      Finding of fact 21

Finding of fact 21 reads:

Prior to speaking with Sgt. Greer at approximately 2:15 A.M., Trooper Walwark had received indication from the hospital that the defendant was ready to be discharged. Therefore, had Trooper Walwark went [sic] outside to his patrol car to prepare the search warrant affidavit, there was no assurance that the defendant would have stayed inside the hospital.

CP at 265.

Womer argues that substantial evidence does not support the trial court's finding that Womer would have been free to leave while Trooper Walwark was preparing the affidavit in support of the warrant. We disagree.

---

[6] Also, Trooper Walwark testified that to obtain a search warrant, he would have gone to his patrol car, parked in the rear parking lot of the hospital. Trooper Walwark further testified that if he had gone to his patrol car to prepare the affidavit, there were no other officers present or available to observe Womer.

Trooper Walwark testified that "the hospital staff informed [him] that [Womer] was medically cleared to be discharged . . . due to minimal injuries." VRP (Dec. 9, 2013) at 42. Trooper Walwark also testified that there was no other law enforcement available to observe Womer, and that if he had gone to his patrol car, Womer could have been discharged and left the hospital without his knowledge.

Thus, substantial evidence supports the trial court's finding that had Trooper Walwark gone outside to his patrol car to prepare the search warrant affidavit, there was no assurance that Womer would have stayed inside the hospital. Accordingly, we hold that Womer's challenge to finding of fact 21 fails.

2.    Exigent Circumstances

Womer contends that exigent circumstances did not exist to justify the warrantless blood draw. We disagree.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution prohibit warrantless searches or seizures unless one of the exceptions to the warrant requirement applies. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "[T]he taking of blood samples constitutes a 'search and seizure' within the meaning of U.S. Const. amend. 4 and Const. art. 1, § 7." *State v. Judge*, 100 Wn.2d 706, 711, 675 P.2d 219 (1984); *State v. Curran*, 116 Wn.2d 174, 184, 804 P.2d 558 (1991) (holding nonconsensual blood test for suspected commission of vehicular homicide is a search), *overruled on other grounds by State v. Berlin,* 133 Wn.2d 541, 548, 947 P.2d 700 (1997).

The State bears the burden of demonstrating that a warrantless search or seizure falls within an exception to the warrant requirement. *State v. Hendrickson*, 129 Wn.2d 61, 71, 917 P.2d 563

(1996). One recognized exception allows a warrantless search and seizure if exigent circumstances exist. *McNeely*, 133 S. Ct. at 1558. "[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances."[7] *Id.* at 1563; *see State v. Smith,* 165 Wn.2d 511, 518, 199 P.3d 386 (2009).

Here, the totality of the circumstances justified a warrantless blood draw. The fatal crash occurred in the early morning hours in an area understaffed by police. Womer was transported to the hospital, and Trooper Walwark went to the hospital to make contact with him there. When Sgt. Greer arrived at the scene of the collision at about 2:00 a.m., almost an hour and a half after the collision, he began his investigation and determined that probable cause existed to believe Womer was the driver and that alcohol may be involved. Sgt. Greer testified that, in his experience, it could take over two hours to obtain a search warrant. Thus, by the time that police established probable cause, about one-and-a-half to two hours had passed since the collision occurred. And, around the same time that police established probable cause, hospital staff advised Trooper Walwark that Womer was ready to be discharged from the hospital. Trooper Walwark testified that he would have to go to his patrol car to write out an affidavit for a search warrant,

---

[7] In *Schmerber*, the United States Supreme Court recognized that exigent circumstances justify a warrantless blood draw where the accused was transported to the hospital and the police had remained at the scene to investigate. *Schmerber v. California*, 384 U.S. 757, 771, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). According to the Court, the evidence could have been lost because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Schmerber*, 384 U.S. at 770; *see McNeely*, 133 S. Ct. at 1558, 1560. The Court noted that "there was no time to seek out a magistrate and secure a warrant." *Schmerber*, 384 U.S. at 771; *see McNeely*, 133 S. Ct. at 1563.

14

leaving Womer unattended by any law enforcement officer. The potential of Womer being discharged from the hospital and leaving, coupled with the anticipated delay in obtaining a warrant, threatened the officer's opportunity to obtain an adequate blood sample via a search warrant. The circumstances here did not allow police to obtain a warrant for a blood draw without "undermining the efficacy of the search." *McNeely*, 133 S. Ct. at 1561. We conclude that exigent circumstances existed that justified a warrantless search.

However, even if the trial court erred by admitting the results of the blood test, any error was harmless. "We apply a harmless error analysis when the trial court admits evidence that is a product of a warrantless search." *State v. Smith*, 165 Wn. App. 296, 316, 266 P.3d 250 (2011), *aff'd on other grounds by* 177 Wn.2d 533 (2013). "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986).

Womer was charged with causing the death of another while operating a motor vehicle: (a) while intoxicated, (b) in a reckless manner, or (c) with disregard for the safety of others. RCW 46.61.520(1)(a), (b), and (c). The jury was instructed on all three alternatives.

The jury could have found beyond a reasonable doubt that the evidence independent of the blood test results showed that Womer was intoxicated while operating a motor vehicle. Trooper Walwark testified that he was trained to detect alcohol and drug impairment. Trooper Walwark further testified that he observed that Womer's hospital room smelled like alcohol, Womer's eyes were "very bloodshot and watery," and Womer's speech was "repetitive, fast, fast rate of speech, and fairly slurred." 2 VRP (Dec. 9, 2014) at 212. Trooper Walwark testified that his observations

"are pretty indicative of using alcohol" and some suggest drug usage. 2 VRP (Dec. 9, 2014) at 212. Trooper Walwark also testified that Womer told Trooper Walwark that he had drunk "four to five shots of alcohol," and smoked methamphetamine and marijuana. 2 VRP (Dec. 9, 2014) at 214. Further, Gingras testified about the effects of alcohol and methamphetamines.

Therefore, even without the results of the blood test, the jury could have found Womer guilty beyond a reasonable doubt of operating a motor vehicle while intoxicated. Accordingly, Womer's challenge to the warrantless blood draw fails.

B.    INEFFECTIVE ASSISTANCE OF COUNSEL

Womer argues that he received ineffective assistance of counsel because trial counsel failed to object to (1) the State's offer of crime scene and autopsy photographs and (2) the State's offer of the blood test results. We disagree.

1.    Legal Principles

We review ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *Id*. To rebut this presumption, a defendant bears the burden of establishing the absence of any legitimate trial tactic explaining

counsel's performance. *Id.* If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel. *Id.*

To establish prejudice, a defendant must show a reasonable probability that but for counsel's performance, the result would have been different. *Id.* at 34. When an appellant's claim for ineffective assistance of counsel is based on counsel's failure to make a motion to suppress evidence, the appellant "must show that the trial court likely would have granted the motion if made." *State v. McFarland*, 127 Wn.2d 322, 334, 337 n.4, 899 P.2d 1251 (1995); *accord State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

2.       Photographs

Womer argues that he received the ineffective assistance of counsel when his trial counsel failed to move to suppress the crime scene and autopsy photographs. We disagree.

Here, the State sought to admit digital photographs of the victim at the crime scene and during the autopsy. Trial counsel and the State agreed on the photos to be admitted. Trial counsel stated that he did not object to the photographs because of the State's burden of proof.

Womer argues that the photographs should not have been admitted because they were not relevant and were only used to prove "the fact at issue that the defense did not even dispute." Br. of Appellant at 41. This argument fails.

Womer pleaded not guilty and asserted a general denial defense. Therefore, the State had a burden to prove all of the elements of the charged crime, including those that Womer did not dispute. *See State v. Oster*, 147 Wn.2d 141, 146, 52 P.3d 26 (2002) (holding the State must prove each essential element of the crime beyond a reasonable doubt). To hold that evidence going to

an element of the crime is irrelevant because it is undisputed would imply that the defendant must dispute each element in order to put the State to its proof. This is contrary to basic principles of criminal law. *See State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011) (holding the State has the burden of proof, and the defendant has no duty to present evidence).

Womer also argues that there was no "possible tactical reason" for trial counsel to fail to move to suppress the admission of any of the photographs. Br. of Appellant at 41. However, the record demonstrates that the State had several photographs it wanted admitted. Trial counsel considered all of the evidence, successfully objected to some of the photographs, and based on the State's burden, determined that the State was within its right to present a limited number of agreed upon photographs. Therefore, the record demonstrates that trial counsel made a legitimate tactical decision not to move to suppress the admission of all the photographs.

Further, Womer has not demonstrated that the trial court would have excluded photographs if trial counsel had made a motion to suppress. *See McFarland*, 127 Wn.2d at 334. The State "is entitled to prove its case by evidence of its own choice." *Old Chief v. United States*, 519 U.S. 172, 186-87, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997); *State v. Finch*, 137 Wn.2d 792, 811, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999). And while both the State and trial counsel acknowledged that the photographs were gruesome, Womer has not offered authority that gruesome, or shocking, or emotional photographs are inherently unfairly prejudicial.

> As much as courts should and do keep a trial clear of potentially prejudicial matter, this obligation, within our concept of a fair trial for an accused, must be applied with the realities of the facts which the state is required to prove. A bloody, brutal crime cannot be explained to a jury in a lily-white manner to save the members of the jury the discomforture of hearing and seeing the results of such criminal activity. Each slide shown had considerable probative value to prove relevant and material issues in the case.

*State v. Adams*, 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds*, 403 U.S. 947 (1971).

Womer has not argued or demonstrated that a motion to suppress the photographs would have likely been successful because the photographs were relevant to the cause of death and the State has a right to present evidence to fulfil its burden of proof. Because Womer has not demonstrated that trial counsel's performance was deficient or prejudicial, his claim of ineffective assistance of counsel fails.[8]

    3.    Motion to Suppress based on *State v. Figeroa Martines*

Womer argues that he received ineffective assistance of counsel because trial counsel failed to move to suppress the results of the blood test because police did not obtain a separate warrant to test the blood, rendering the results inadmissible under *Figeroa Martines*.[9] We disagree.

In August 2014, the State moved for a court order under CrR 4.7(b)(2)(viii) to have Womer's blood tested, approximately three weeks after *State v. Figeroa Martines* was published

---

[8] Womer asserts in the last paragraph of his argument, without authority or further argument, that trial counsel was ineffective for failing to move for a mistrial after juror 8 fainted. We do not address this assertion because Womer does not assign error to the failure to make a motion for a mistrial, and fails to provide authority or adequate argument. RAP 10.3(a)(6).

Also, after Juror 8 fainted, at trial counsel's request, the trial court excused juror 8 and brought in an alternate juror. Therefore, Womer is unable to show prejudice.

[9] Womer also argues that "trial counsel's failure to get the results of the blood test suppressed undermines confidence in the outcome of the trial, particularly on the first alternative method of committing the offense." Br. of Appellant at 47. Counsel would not be ineffective for being unsuccessful in his motions practice. The question here is whether counsel's failure to make a motion to suppress on the basis of *Figeroa Martines* was deficient.

in July 2014.[10]  In *Figeroa Martines*, Division One of this court held that the "State may not conduct tests on a lawfully procured blood sample without first obtaining a warrant that authorizes testing and specifies the types of evidence for which the sample may be tested."[11]  182 Wn. App. 522.  *Martines* does not involve a court order or speak to the validity of a court order under CrR 4.7(b)(2)(viii) instead of a warrant under CrR 2.3.

Here, trial counsel was not deficient for not moving to suppress the results of the test that was performed without a warrant because the test was performed with a court order under CrR 4.7(b)(2)(viii).[12]  Therefore, the error that Womer alleges does not exist in the record.  Furthermore, if trial counsel had objected, it is not likely that the objection would have been upheld because the blood was tested pursuant to court order and, therefore, not in violation of *Martines*.

Womer cannot demonstrate deficient performance or prejudice.  Therefore, his claim of ineffective assistance fails.[13]

---

[10] Womer does not address the existence of or challenge the validity of the court order.  "Normally, a warrant in Washington State is issued under CrR 2.3, but neither the state constitution nor federal constitution limits warrants to only those issued under CrR 2.3.  "A court order may function as a warrant as long as it meets constitutional requirements." *State v. Garcia-Salgado*, 170 Wn.2d 176, 186, 240 P.3d 153 (2010).  There is no indication that the court order here failed to meet those constitutional requirements.

[11] The Supreme Court reversed, holding that "a warrant authorizing extraction of a blood sample necessarily authorizes testing of that sample for evidence of the suspected crime" and the search "did not exceed the bounds of the search warrant when a sample of Martines's blood was extracted and tested for intoxicants." *Figeroa Martines*, 184 Wn.2d at 94.

[12] Womer also argues that trial counsel was probably unaware of the *Figeroa Martines* decision. Br. of Appellant at 46.  But trial counsel referenced *Figeroa Martines* in the second motion to suppress, which demonstrates that trial counsel was aware that it existed.

[13] Moreover, even if the trial court had ruled the results inadmissible, Womer has not demonstrated that but for trial counsel's failure to object, the outcome of the proceeding would have been

D.    LEGAL FINANCIAL OBLIGATIONS

Womer argues that the trial court erred by imposing LFOs and restitution without considering Womer's current or future ability to pay. Womer's challenge fails.

First, Womer affirmatively waived any objection to the imposition of restitution and standard LFOs. Therefore, we need not consider Womer's challenge.

Second, Womer does not distinguish between mandatory LFOs, for which the trial court need not consider the defendant's ability to pay, and discretionary LFOs, which are subject to the requirements of RCW 10.01.160(3); *see State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013). Here, the trial court imposed restitution, a crime victim assessment, a filing fee, and a deoxyribonucleic acid (DNA) collection fee. Restitution is mandatory pursuant to RCW 9.94A.753(5). *Lundy*, 176 Wn. App. at 102. The crime victim assessment is mandatory under RCW 7.68.035. *Lundy*, 176 Wn. App. at 102. The filing fee is mandatory pursuant to RCW 36.18.020(2)(a) and (h). *Lundy*, 176 Wn. App. at 102. And, the DNA collection fee is mandatory under RCW 43.43.7541. *Lundy*, 176 Wn. App. at 102. Thus, the court imposed no discretionary LFOs. "Because the legislature has mandated imposition of these legal financial obligations, the trial court's 'finding' of a defendant's current or likely future ability to pay them is surplusage." *Lundy*, 176 Wn. App. at 103. Thus, Womer's challenge fails.

We affirm.

---

different. Womer was charged with causing the death of another while operating a motor vehicle: (a) while intoxicated, (b) in a reckless manner, or (c) with disregard for the safety of others. RCW 46.61.520(1)(a), (b), and (c). The jury was instructed on all three alternatives. The jury returned a special verdict finding Womer guilty under all three alternatives. Therefore, even without the results of the blood test, the jury could have found Womer guilty based on RCW 46.61.520(1)(b) or (c).

No. 47025-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, J.

Johanson, C.J.